WIDDERS *v.* WIDDERS.

4-7291                                                      182 S. W. 2d 209

Opinion delivered June 26, 1944.

*John Mayes,* for appellant.

*G. T. Sullins* and *Rex W. Perkins,* for appellee.

ROBINS, J. Appellant, Clyde M. Widders, filed suit in the lower court against his wife, appellee Virginia Mae Widders, asking for divorce and custody of their three-year-old child, Eva Ruth Widders. For ground of divorce appellant alleged adultery by appellee with one P. T. Wollert. Appellee filed answer and cross-complaint denying the material allegations of appellant's complaint and alleging that appellant had been guilty of such indignities, abuse and physical violence to the person of appellee, as well as drunkenness, as to make life for appellee intolerable; and appellee prayed that she be granted a divorce from appellant and given the custody of their minor child.

From the decree of the lower court dismissing his complaint for want of equity and granting appellee a divorce and custody of the minor child appellant prosecutes this appeal.

Appellant and appellee were both reared in Fayetteville, Arkansas, and were married there on June 10, 1939. In June, 1942, they went to San Diego, California, where appellant obtained employment. On November 11, 1942, appellant was inducted into the United States Army, from which he was honorably discharged on March 30, 1943. While living at San Diego appellee became acquainted with P. T. Wollert and his wife. For a time after her husband was inducted into the army appellee lived with appellant's brother, who was in business at San Diego. In January, 1943, appellee went from California to Waterloo, Iowa, in company with Mrs. Wollert and remained with Mrs. Wollert until the latter's child was born. On February 26, 1943, appellee, accompanied by her child, went to Daytona Beach, Florida. A few days thereafter Wollert followed her to Florida.

During the time appellee was in Florida she corresponded regularly with her husband, but sent her letters to Waterloo, Iowa, to be mailed to her husband so that he would not know that she had left Waterloo. When appellant was discharged from the army he went to Waterloo for the purpose of taking his wife and child

back to San Diego, at which place he expected to resume his former work. When he arrived at the Wollert home in Waterloo, where he expected to find his wife, Mrs. Wollert apprised him of the situation and of the relationship between appellee and Wollert. Mrs. Wollert also turned over to appellant certain letters which she had received from Wollert and appellee, in which they frankly admitted their mutual infatuation and asked Mrs. Wollert, who had four children by her husband, to give up her husband so that appellee might marry him. Wollert was in the navy but was stationed in Florida. In one of these letters written by appellee to Mrs. Wollert appellee said: "It seems that I am just a woman stepping in and breaking up a home. But, Jeannie, if I didn't love Tag (Wollert) more than life itself and have been deprived of happiness so long, I would turn my back and walk out. But honestly, Jeannie, Tag seems to love me as much as I do him and I could never live without him and I am led to believe that he feels the same way toward me. Life to me just wouldn't be the same if I ever had to give him up and I am living on my prayers that the navy doesn't send him out to sea. . . . But there are no words that can explain my feeling for Tag. I worship him. In fact I would like to put him on a pedestal and worship him forever. Our love has been shared such a short length of time that it seems impossible that two people could care so much for one another." In the meantime appellee was writing very devoted letters to her husband in the army, in which she did not hint at any difference between them.

On the witness stand appellee frankly admitted her infatuation for Wollert and stated that she did not expect to live with her husband any more. When asked why she wrote affectionate letters to her husband while he was in the army she admitted that she was deceiving him but said: "I was trying to keep up his morale." She denied any wrongful conduct with Wollert. This appears in the record of her testimony: "While you were down there with Tag trying to break up his home, were you getting pay from your husband in the army? A. I was receiving

my government check. Q. And you were spending it, getting his money, flirting around with Tag, wanting to marry Tag and break up his home. A. That's right.'' She was asked if Wollert had obtained a divorce from his wife and answered that he had not. ''Q. He has never filed for one as far as you know? A. No. Q. That will mess up your plans, won't it? A. I don't have to marry the man. Q. You want to though, don't you? A. I would love to.'' While appellee in general terms denied adultery with Wollert, we are unwilling to say that her conduct in deceiving her husband as to her whereabouts, in making a trip across the continent so as to be near another woman's husband whom she brazenly says she loves was that of an innocent wife.

To sustain the decree of divorce granted appellee by the lower court counsel for appellee argue that it clearly appeared at the trial that a reconciliation between the parties was impossible, and the record shows that counsel for both parties stated that a divorce was desired. In other words, it is argued by counsel for appellee that appellant in effect consented and agreed to the decree of divorce and cannot be heard in this court to ask that same be set aside.

Under the law (except where it is expressly provided otherwise by statute) divorce is a remedy for the innocent against the guilty. 27 C. J. S. 623. In Nelson on Divorce and Separation, vol. 1, § 428, it is said: ''Divorce is a remedy provided for an innocent party.'' To the same effect is the statement of the law in these authorities: Stewart on Marriage and Divorce, § 314; Brown on Divorce, p. 84; *Wilson* v. *Wilson,* 128 Ark. 110, 193 S. W. 504; *Malone* v. *Malone,* 76 Ark. 28, 88 S. W. 840; *Healy* v. *Healy,* 77 Ark. 94, 90 S. W. 845. Mr. Bishop in his work on Marriage, Divorce and Separation (vol. 2, p. 165) uses as his text this quotation from an opinion by Lord Ardmillan: ''I think that there enters inherently and deeply into the contract of marriage an obligation before God and man that the contract shall be faithfully kept by both of the contracting parties. Divorce is in my opinion a remedy provided for the innocent party, and is not in-

tended for cases in which both parties are guilty. There is the highest authority in the law of England to that effect."

Before a suitor may be granted a divorce it must ordinarily appear that the party asking for the divorce is innocent and the one from whom the divorce is sought is guilty of some act or conduct which the law has designated as ground for divorce. Nor will the consent of the party against whom the decree is rendered authorize the granting of the divorce. "A divorce proceeding is one in which the public is interested. The parties can waive nothing essential to the validity of the proceeding, and all statutory requirements must be observed." *Whitford* v. *Whitford,* 100 Ark. 63, 139 S. W. 653.

When the rules above stated are applied to the evidence in this case it must be held that the lower court erred in granting a divorce to appellee. While the only evidence of appellee's misconduct with Wollert was contained in the testimony of appellant and in the admissions of appellee, which, under the law, was not sufficient to authorize the granting of a divorce to appellant, it was conclusive of such guilt on the part of appellee as would require a denial of a divorce to her.

The evidence showed that appellee purposed to leave her child with appellee's mother. Appellant expected to leave the child with his mother, who testified that she had had the care of the child at one time for about sixteen months, was devoted to it and was willing to care for it. The conduct of appellant, as shown by the testimony, has been far from exemplary, but no criticism whatever was leveled against appellant's mother, and this cannot be said of any of the other leading characters in the sordid drama reflected by the record in this case. Decisions in cases involving the custody of a child of tender years are the most difficult ones that judges have to make. The natural ties of affection of the parent, especially of a mother, for the child must be considered, but the paramount consideration in cases of this kind must always be the welfare of the child. The mother of this child, to whom the lower court awarded its custody, admitted not

only loss of love for her husband but a shameless desire and intention to break up another home and take a husband away from his wife and a father away from his four small children. She expressed no regret for her infidelity. Nor did she offer any promise of reformation. We conclude that it is unreasonable to assume that appellee will give to this little girl the necessary care and guidance or will exert on it the proper influence during the formative years of the child's life.

So much of the decree of the lower court as denies a divorce to appellant is affirmed and the remainder of the decree is reversed, and this cause is remanded with directions to the lower court to dismiss the cross-complaint of appellee for want of equity, and to award the custody of the child of appellant and appellee, Eve Ruth Widders, to appellant, with the right on the part of appellee to visit said child and to have said child visit her at such times and under such conditions as the lower court may deem proper; and all costs of both courts to be assessed against appellant.